Next case on the second is docket is the case of People's State of Illinois v. Milton and Nancy Menard. We have Mr. John Dutton for the appellant and Ms. Jennifer Camden for the appellant.  John Dutton May it please the court, I'm John Dutton, the counsel for the intervening party and appellant in this case, Nancy Menard. This is an appeal from the Honorable Richard Brown, Circuit Judge Randolph County, Illinois. The judge ordered that was entered on June 17, 2011, which permitted the confiscation of firearms that we are claiming belong to Nancy Menard. Nancy had filed the appeal on this case and the facts of this case are basically Nancy, who is 75 years old, is married to Milton Menard, had been for over 25 years. She lives with her husband in Ruma, Illinois, Randolph County. Nancy is the sole owner of the real estate that they live on. Milton is a convicted felon from a prior felony conviction. On August 9, 2010, police under search warrant went into their home, seized a .38 caliber handgun that Milton had in his possession in the house by a chair, I think, that he was sitting in the front room. Subsequent to that, police went back, got a second search warrant, and then they seized other guns that they had found in the house. These guns were disclosed to them by Nancy Menard. Milton was charged with the unlawful possession of a weapon by a firearm, being a .38 caliber handgun. Through a negotiated plea, he pled guilty to that charge, and the court set a date for a forfeiture hearing of all of the firearms and ammunition that wound up being attached to the court's order. On May 5, 2011, Nancy filed to intervene, claiming that she was the owner of this property and she was seeking return of the firearms and ammunition. Following a hearing on the forfeiture, the court denied her claim and ordered that the firearms be transferred to the sheriff of Randolph County for the sheriff to destroy them or preserve them as property of Randolph County Sheriff's Office. In the judge's order, when the judge had heard the testimony, and there was exhibits, there was evidence that was presented to the court, there was a testimony by Nancy herself. She took the stand and testified. The state used the testimony, I believe, of two officers, one a city officer who briefly testified, didn't really know much about the case, and the second was an officer by the name of Wolf, whom I believe is a representative of the County Sheriff's Department. The trial court, upon hearing the evidence, entered its ruling, and its ruling was that the court allow the forfeiture of all of these firearms that are on this list attached to the court's order, and that list consists of about 90 firearms. How many? About 90, I believe, Your Honor. Ninety, okay. The court ordered this forfeiture and did so pursuant to what I believe was its authority under 720 ILCS 5 backslash 24-6. That is cited in my brief under statutes involved. The court ordered that forfeiture, and the court did so without actually going through the analysis and making a determination of whether or not the firearms were actually contraband. You cannot seize a person's property under this statute unless you first make that determination that it is contraband. The court made no such finding or determination. Contraband can consist of two things according to the case People v. Earl. Contraband can first be a per se contraband. That would be like a sawed-off machine gun or something that's totally illegal to have. You can't get a permit for it. You can't have it. Per se, it's contraband. If you have that under the statute, it can be seized. The other form of contraband is derivative contraband, and that would consist of weapons that are used or possessed in an illegal activity determined by the defendant's offense conviction. Trial court failed in this case to find that these guns that Nancy's claiming are her guns is contraband of either or not, either derivative or per se contraband. Didn't Deputy Wolf testify to some statements that Nancy made that he posited were pretty clearly statements that indicated that the guns were hers and not her husband's? I'm sorry? I thought that Deputy Wolf stated that Nancy told him that the guns were her husband's, that he had the keys to it. But she didn't know where the keys were and that they were his. You are correct, Your Honor. At trial, however, that was not what she stated, correct? Deputy Wolf did say that at the trial. So don't we have a credibility issue that determines whose guns the possession were in? There is also that part of the issue on this case, credibility. You have the issue of the ownership of the guns and the issue of the possession of the guns and whose possession they were in and who owns the guns. And that's part of this case. And I believe that's why the state was bringing in Deputy Wolf to testify. And Deputy Wolf did testify that at the time of the search warrant being served, he was present at the home, he claimed that Nancy had said that the guns were those belonging to Milton. Nancy, in her testimony on that case at the same hearing, said, I had told him that Milton had guns. And Milton had guns from his father and from relatives. And that's what I was referring to. He had guns. Nancy herself said she had guns. And Nancy herself, besides testifying, had submitted as evidence the fact that she had purchased guns. There were receipts that were supplied to the court as evidence. She had inherited guns and she had guns that were gifts. She further testified that she owned guns before she even married Milton. She also testified that she had a FOIA card and she'd had a FOIA card for over 19 years. She testified that she was an NRA member since April of 1992. She owned guns before the marriage, as I said. She said that her guns that she owned was over $50,000 to $60,000 in value, according to her testimony. None of these things that she testified to was rebutted. There was no impeachment of that testimony. Well, except that, I read that Deputy Wolf said that she denied that she owned the guns at the time he executed the search warrant and denied that she had keys to the rooms where they were contained and that they were her husband's guns. Which does bring the question of credibility before that trial court. Because Deputy Wolf, when he said that, later admitted on cross-examination that even though he first testified she didn't have the keys, she didn't know where the keys were, then in the cross-examination he admitted she went and got the keys. And then he also admitted that it didn't take her very long at all to go and get the keys. Therefore, his own testimony shows that Nancy knew where the keys were, Nancy had the keys, and it was no problem for Nancy to get the keys. That flies in the face of his contradictory statement in which he said, well, she didn't know where the keys were. He knew, he knew differently. You have to look, I think the court also has to consider, when you consider credibility of a witness, you have to consider who this witness is and what motivation they may have to shade maybe the truth or to stretch things. You have a deputy here who's working with the Sheriff's Department and they're trying to confiscate under forfeiture a large quantity of firearms that's very valuable. Some of these are antique guns. The interesting thing is they didn't make separate charges for a charge that included multiple counts of these, multiple firearms in the counts, but they could have done because if they had done that, they would have had to prove beyond a reasonable doubt that those guns were possessed by Milton or those guns were owned by Milton and he couldn't have them because he was a felon. But the state didn't do that. That's not what they did. They took the easier route and what they did was they waited until the criminal plea was done, they had to negotiate a plea with Milton, and then they did this forfeiture is what they did. And under the forfeiture, the burden of proof is lesser. It's just proving by preponderance of the evidence. It's like a civil case. You prove that and wow, you got $50,000, $60,000 worth of guns that the Sheriff's Department can do with as they please. Whereas otherwise, you'd have to go through the criminal trial and you'd have to prove by a stiffer burden beyond a reasonable doubt before you could wind up with those guns. That's the problem that we have here. He's testifying and he's testifying from a position of someone who his employer is going to benefit and possibly he's going to benefit by his testimony. I think a trial court has to take that into consideration. There was no evidence given by the state that Milton owned the guns. Milton didn't testify. They brought in no documents to say that he owned the guns. Were there documents that stated that she owned the guns? Because I did not see that in the briefs. There are receipts in the record. That show that she owned the guns? Not all the guns. I wasn't a counsel for the trial itself. And I had looked at the record and the court has that record. There are some receipts that show that she didn't literally have a receipt for every single gun. But the state brought in virtually nothing on the guns. And even Judge Brown's judgment on this doesn't really say that Milton is the owner of the guns. It doesn't have to. He could possess them. Right. The court said that the court is going to infer that he possessed them. And inside of the case of Rangel, I believe, was a case that the court used to infer that. However, when you look at the Rangel case, under the Rangel case, that case involved a situation where, if I can find that real quick here, that involved where you can infer possession in a criminal case. But that case talked about there being an exclusive and immediate control of a weapon, which was a gun. And it was in the car next to the defendant. And it was right on the floor. And the defendant had exited the car and the police officer found that gun. Therefore, the police officer inferred, since that was in a car owned by the defendant, the defendant had just been in, and the gun was down on the floor besides the driver, inferred that that was in immediate possession and control. That's far different than the situation we have here. We have the guns that are ñ Nancy's guns are locked up in a bedroom in her house. And that house has several bedrooms. But the one that the guns are in is locked. And also, the majority of the guns were in cabinets that were also locked in the bedroom as well. There was also a statement, though, I believe, that he had no access to the room where the guns were locked. That is correct. But I think Deputy Rose said that there were vents closed and strewn around the room. There were guns in cabinets and guns that were not in cabinets, but they were in that locked bedroom. That is true. But I thought that there was a statement he made that it looked like there was at least somebody using it perhaps as a bedroom. I don't know. There were clothing. There was male clothing strewn around the room. His testimony is not clear as to what he's talking about because that bedroom, that house has several bedrooms. And the room, and I think her testimony was the room that was locked, was not used by either one of them for sleeping or whatever. That's where the guns were kept. So I think his testimony is testimony saying when I came in and I looked around in the house, I saw bedrooms and clothes thrown down on the floor. I saw a gun that was in the kitchen. That was a gun belonging to Milton, a .22 caliber rifle, I believe, that did not function. The most amazing thing about this entire case, the state really forcefully tried to obtain a forfeiture on these guns. And yet, amazingly enough, the state turns right around and gives back precisely guns to Milton, including the gun that he was charged with and convicted of, the .38 caliber gun. They give it to Milton so that he can turn around and give it to his grandson. And I think I mentioned that in my brief as well. The state knew very well what guns were owned by Milton, and he claimed it's his, and they allowed those guns to be possessed by his family. And I do think there's case authority to do that, and they did that. I think it's the People v. LaSure case. Can you distinguish the People v. Van Landingham case from the facts in your case? That was a case cited, I think, by the state in their appellee brief. And the thing about that case is that case is distinguishable from ours. I mean, there were a lot of similarities in the facts as I read them. That case is distinguishable from ours. It's the one where they were found in the home, and she claimed they were his, and then she turned around and said they weren't. They were in a firearm business. Yes. There was a firearm business that they ran. Thank you for jogging my memory. That's okay. And in this firearm business that they ran, she had endorsed over and wrote out, like a bill of sale, a transfer, whatever, of all of these guns, and she did it over to her husband, who wound up being the defendant on this case. And it was much, much, much later that she came forward and said, or he said or they both said, really those guns belonged to her. And the court found that not to be credible at all because they both admitted that she had actually done the transfer. But they claimed something about, well, he transferred them back, but, gee, we can't come up with a document or whatever. That case is distinguishable from our case because, in that case, it's admitted that the defendant did own and did possess the guns. And even the person now claiming his wife, I want those back. I don't want to forfeit. Even she had to admit and testify what was seized actually did belong to him, and she had actually transferred the guns. So that's distinguishable from our situation here. The bottom line in this case is that this was Nancy's home. This wasn't Milton's residence. He did own it. He did live there. However, Nancy controlled part of the house. She had locked up some of the rooms. She had the key. She had locked up guns. When you say it's Nancy's home, that she was on the title and he wasn't? That's correct. But had she been married like 25 years? That is correct. And living in that home? I believe so. That is correct. But it's not like the case that I was just talking about where the gun was found in the defendant's car and the defendant owned the car. This is a situation where I don't believe that you can say that he owned the home, therefore he had access to everything because he was the owner of the home and any property that was anywhere was his. That's not necessarily the case here. Nancy knew that he was a felon, and Nancy kept the guns locked up for that reason. Now, that puts you in a dilemma. What do you do when you're married to a spouse who is a felon, and yet you have a Second Amendment right to have a gun yourself? But doesn't that also, you're talking about the state's motive in forfeiture. Doesn't she have a motive to say that they're her guns when in reality they may be his guns and the court could have considered that in its credibility determination? She could say that. There would be a problem with some of the receipts if she had said that. And I believe there have been cases where that has been questioned by a spouse that has come forward and said something. But Nancy was very prompt in saying in the beginning and asked to join the case as an intervener. And Nancy freely showed them the property, and only she knew where the key was, and only she was the one that unlocked it, and she did it very promptly. Even Deputy Wolf had to admit that, which that altered his testimony. Nancy has consistently stated throughout the whole thing, these are really my guns. Now, if the state was interested in confiscating all the guns because Milton owned and possessed them, why didn't they not confiscate and do the forfeiture on the guns that they gave back to him? I'm just totally mystified. They gave back his guns, and they knew what his guns were and what he possessed and claimed his ownership and possession, and yet they did the opposite for Nancy. So, you know, I think you consider all of these factors and all these things, it boils down to courts, I think, are very reluctant and abhor a forfeiture of someone's property. Many of these cases cite that. And because of that, you strictly construe a statute that's going to take away a citizen's property and their right to their property. And that's why we're here, and that's why we have such a problem with this. There's a large amount of value to these guns, and she testified that she'd been buying and saving these over the years for investment for her retirement. So it makes a lot of sense, everything that she's saying, and the effort she's put forth to try to obtain a dissolution of this forfeiture order. And for those reasons I've argued, Your Honors, we would ask the court very respectfully to please undo and reverse the forfeiture orders and order the return of the firearms and ammunition back to her. I thank you very much. Thank you, Mr. Dunton. You'll have the opportunity to reply. Thank you. Ms. Camden, can you answer, or what is your position on why the court, or the, not the court, I guess it was the Sheriff's Department, gave back some of the guns to the defendant? Ma'am, police, court, counsel. Your Honor, actually the record reflects that the firearms were not returned to the defendant himself, but to his grandson. On what basis? Who had a Floyd card. That's the other thing. The basis was not whether certain of the guns were the defendant's and certain of the guns were the intervener's. The basis for deciding which guns, and it was about 15 that were to go to the grandson, was that those were guns that had belonged to the defendant's late father and brother. Those had been purchased before the defendant obtained his felony conviction, and so those were the guns that the state agreed it would not seek forfeiture of. So they were not returned to the defendant himself, but to his grandson, who also, so the great-grandson of the prior owner of the guns. I guess that if the basis for the forfeiture was that they were in his possession and control, I'm having trouble following that rationale. If they were in the house, all of the guns, including the 15. I believe it may have been a condition of the plea agreement, Your Honor, or something that was worked out at that stage. It seemed already to have been agreed to during the proceedings that are on the record in this case. But those 15 guns were in the house with the others, but these were sets that had previously belonged to the father. Did the defendant say that his wife owned any of the guns? The defendant did not testify at the forfeiture hearing. He knew that the grandchild had 15, right? I'm sorry? The 15 guns that were for the grandchild, right? Did he also say that his wife had some guns also in there? I don't believe the defendant didn't testify at the hearing, Your Honor. So we don't know what his position was? That's correct. A couple of other points. I believe the total number of firearms found in the home was 75. I didn't see a figure of 90 in the envelope of documents. I guess 75 plus 15 would make 90. I guess it would. Yeah, but in the record it talks about 15 and then a different set of 60. I see. So I'm not sure. It's a lot of guns. We can agree on that, I think. But the record contains two slips of paper that appear to be receipts. I would point out that the defendant did not have a FOIA card when those guns were purchased. But do they have anybody's name on them, or did it just show that they were purchased? I mean, they're just receipts, or does it have Nancy or the defendant's name on the receipt? Actually, I cannot recall, Your Honor. I'm sorry about that. They are in the envelope, in the middle envelope in the record. Another point is that there were two sets of keys, actually, that we're talking about. So two different rooms? No, Your Honor. Oh. There were two different bedrooms and then also two sets of keys. The one bedroom in which four guns were found in a dresser drawer was an unlocked bedroom, and in that bedroom were defendants' work shirts and clothes. That was an unlocked bedroom containing a dresser with a drawer that contained four guns. The officer asked the intervener why they were there. She replied, that's just where he keeps them. The different bedroom was the locked bedroom, and this was the room that the intervener went and got the keys for. So she knew where those keys were and came back and unlocked the room, but then revealing a number of guns, some contained in locked cabinets and others just loose in the room. Now, and this other room is a bedroom as well? I don't believe that it was used as a bedroom. There are some pretty murky pictures of it in the record, but it appears to just be a room for guns. So this room contained cabinets, and the cabinets were locked. The officers asked the intervener where the keys were, and that was when she said, I don't know where he keeps the keys. It's his collection. So it wasn't that she didn't know where the keys to the room were. It was that she didn't know where the keys to the cabinets in the room were. And based on this, and by the way, those statements were contained, of the intervener, were contained in the contemporaneous police reports. And I mentioned this in response to the allegation of bias by the witnesses. So based on this, and then at the hearing, the intervener, of course, testified that the defendant did not have access to that room, and that they were her guns and not his. And based on this difference, the variance in the statements made during the search, the court made a credibility determination and determined that the defendant was in possession of these firearms, and this ruling was not against the manifest weight of the evidence, where the officer testified that the intervener said that they were not hers during the search. And because the intervener was not in sole possession of the firearms, they were also illegally possessed by the defendant at the time of the offense in this case, and therefore they were a derivative contraband that can be forfeited. Well, but there was no determination of that. The only on the 38. Well, Your Honor, the 38 was the subject of the charge and the conviction. Okay, but there was never a litigation that determined that he was in possession of any of the, as a felon, in possession of any other firearms, was there? No, Your Honor, the only charge and the only conviction in this case was the unlawful. I understand that, just the 38. Yes, that's right. That's no problem. Right. Now, the other weapons, you just said that he was in possession as a felon. Well, that is a determination to be made, isn't it? Well, Your Honor, under case law, cited in the People's Brief, those other weapons, whether it's 74 other weapons or 89 weapons, still can be classed as derivative contraband. For example, in People v. DeLuca, which is cited in the People's Brief, a defendant was convicted of four counts of unlawful sale of the firearms and two counts of unlawful use of firearms. His home was searched and 138 more weapons were found. And these were not, as in this case, the subject of any charges. And the issue in that case was whether those 138 guns could be forfeited. And the court held that they counted as derivative contraband. Because they had to relate to the subject matter of the charge, correct? Right, Your Honor. The question was whether the state could demonstrate by a preponderance of the evidence that the guns were closely connected to the illegal activity at issue in that case. And because the illegal activity in that case was the sale of firearms, the court reasoned that these guns must have been part of the inventory and thus were closely connected to the illegal activity and could be forfeited. And that's the theory that obtains here. I'd note that the court in this case did find, as a matter of fact, that the guns should be confiscated as weapons illegally possessed by a felon during the commission of a criminal offense. That's contained in the common law record on page 128 in the first page of the court's forfeiture order. The court did find that these weapons were illegally possessed during the commission of the criminal offense. And that's a finding that the guns were derivative contraband and thus subject to forfeiture. Actually, that concludes my prepared remarks. Thank you, Ms. Campbell. Do you have any rebuttal, Mr. Gunter? So that I don't appear to be misleading the court, I was reciting the mathematical number of 90. And I'm not very good at math either, but I thought I counted up in the judge's order that many guns that he had put and attached to the order. I don't think any of us are rolling up on those numbers. Okay. It's a lot of guns. Close. Thank you. I think we would all agree it's a large quantity of guns we're talking about. And the point and rebuttal that I'd like to make is I think we're trying to use a machine that's a sledgehammer to be excessive and try to confiscate a lot of property that I don't believe could have been confiscated in any other way or fashion or form. And the facts of this whole case are very, very disturbing and troubling when you look at the totality of exactly what happened from the moment the police went in to when the judge finally ruled at the end of the forfeiture hearing. Well, there certainly is the potential for abuse. Does she claim that she never said that that was his collection? She claimed that in the testimony, I believe, on the record, she claimed that he did have guns and they were there. And she had referred to as Milton's guns. And she acknowledged that he owned guns. But the guns that he owned,  I subsequently talked to both of them. But from what I gathered from the record, I believe she made it very clear that she had her guns and Milton had his guns. Being a felon, he shouldn't have his guns, but he acknowledged he had guns and these were the guns that were given back to him by the state. And the court condoned it. So I believe that it's against the manifest weight of the evidence and the entire picture. If you look at this for the court to rule that he was in possession of virtually all of these guns and therefore they can be confiscated. I thank you. Thank you. Thank you both for your briefs and arguments. We'll take a matter under advisement and render a ruling in the court.